(No. 85134.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MILTON JOHNSON, Appellant.

*Opinion filed April 18, 2002.—Modified on denial of rehearing May 29, 2002.*

HARRISON, C.J., specially concurring.
KILBRIDE, J., concurring in part and dissenting in part.

Marshall J. Hartman, Deputy Defender, and Kim Robert Fawcett, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jeff Tomczak, State's Attorney, of Joliet (Joel D. Bertocchi, Solicitor General, and William L. Browers and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FITZGERALD delivered the opinion of the court:

The defendant, Milton Johnson, appeals a Will County circuit court order dismissing his first amended post-conviction petition without an evidentiary hearing. Because the defendant was sentenced to death, his appeal lies directly to this court. See 134 Ill. 2d R. 651(a). We now affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

On July 16, 1983, Patricia Payne and her boyfriend, Anthony Hackett, drove from their hometown of Emden, Illinois, and spent the day at Great America Amusement Park in Gurnee, Illinois. That day, Hackett bought a stuffed doll depicting the popular Tasmanian Devil character; he placed the receipt for the doll in his wallet. Around 10 p.m., Payne and Hackett left the park and, on the way home, they stopped Hackett's car along Interstate 55 in Will County to sleep. Hackett slept in the front seat; Payne slept in the back.

Around 1:30 a.m. on July 17, Payne awoke to tapping on the passenger-side window followed by gunshots which struck and killed Hackett. The assailant opened the passenger-side door and ordered Payne to give him Hackett's wallet and her purse. He then ordered Payne to crawl from the car and into a pickup truck parked nearby. The assailant climbed into the truck and drove down the interstate. While driving, the assailant sexually assaulted Payne; after exiting the interstate and stopping the truck, he raped her. The assailant again started to drive, but pulled the truck onto the shoulder of the road 10 minutes later. The assailant then stabbed Payne in the chest and dumped her from the truck. Payne was found on the grassy median an hour later at 5:30 a.m. by a passing motorist. She had no pulse or blood pressure, and she was rushed to a Joliet hospital, where doctors performed emergency surgery. Payne survived.

Later that morning, Special Agent John Meduga of the Illinois Department of Law Enforcement (now known as the Illinois State Police) spoke with Payne. Payne indicated to Meduga that her assailant was an African American man with no observable facial hair. Eight days later, Payne looked through approximately 1,500 mug shots and selected 42 photographs of persons with facial characteristics similar to her assailant, 34 of whom had facial hair. The record does not reveal whether the

defendant's photograph was chosen by Payne. More than a month later, Payne looked through 137 mug shots, including one of the defendant, and selected four photographs of persons with facial hair and facial characteristics similar to her assailant. Payne did not choose the defendant's photograph.

The police investigation into these crimes stalled until Ann Shoemaker telephoned the Will County sheriff's office in February 1984. Shoemaker described an incident in which a dark pickup truck had passed her several times while she was driving one night in July 1983. She and a friend followed the truck and recorded its license plate number. On March 6, 1984, she gave this number to the police, who traced it to a truck owned by Sam Myers, the defendant's stepfather. After Myers signed a consent form, the police searched the truck and found Caucasian head hairs similar to Payne's hair, bloodstains, a steak knife, reddish brown fibers, and a sales receipt for a Tasmanian Devil stuffed doll. Based on these items, the police obtained a search warrant for Myers' residence, where the defendant lived. The police seized three .357 Magnum cartridges from a dresser in Myers' bedroom.

Also on March 6, 1984, Payne looked at five mug shots. The defendant's photograph was the only one among the five which Payne had seen on September 6, 1983. After several minutes, Payne tentatively identified the defendant as her assailant. On March 9, Payne viewed a six-person lineup. After each person in the lineup repeated commands that the assailant had given Payne on the night of her ordeal, Payne unmistakably identified the defendant as her assailant.

Initially, the Will County public defender was appointed to represent the defendant. On June 1, 1984, the day before the scheduled trial date, William Swano entered his appearance as the defendant's retained at-

torney. The trial court granted Swano three continuances, totaling 55 days, and set the trial date for July 26, 1984. The defendant moved for a change of venue, citing negative pretrial publicity in Will County, and the trial court transferred the case to Iroquois County. Following a jury trial, the defendant was convicted of the first degree murder of Hackett, as well as the aggravated kidnapping, deviate sexual assault, rape, and attempted murder of Payne. The defendant waived his right to a sentencing jury, and the trial court found the defendant eligible for the death penalty. The trial court further found no mitigating circumstances sufficient to preclude the death penalty and sentenced the defendant to death for Hackett's murder and to concurrent terms of 40 years' imprisonment for deviate sexual assault, rape, and attempted murder. On direct appeal, this court affirmed the defendant's convictions and sentences. See *People v. Johnson*, 114 Ill. 2d 170 (1986).

The defendant then filed a *pro se* post-conviction petition in the Will County circuit court, alleging that he received ineffective assistance of counsel on direct appeal and in post-conviction proceedings. The trial court granted the State's motion to dismiss the petition. On appeal, we affirmed in part, reversed in part, and remanded. We held that the trial court properly dismissed the defendant's claim of ineffective assistance of appellate counsel, but that the trial court improperly dismissed the defendant's claim relating to his post-conviction attorney's performance. See *People v. Johnson*, 154 Ill. 2d 227 (1993).

On remand, the defendant filed a nine-count first amended post-conviction petition, which is the subject of this appeal. The State filed a motion to dismiss, and, in a written order, the trial court dismissed the defendant's amended petition without an evidentiary hearing. This appeal followed.

## ANALYSIS

On appeal, the defendant has shuffled and refashioned the claims raised in his amended petition. He essentially raises seven issues: (1) whether his pending execution is unconstitutional because the State possesses forensic evidence which would help establish his innocence through DNA testing; (2) whether he was denied due process because the trial court refused to grant Swano sufficient time to prepare the defendant's case for trial and sentencing; (3) whether he was denied effective assistance of trial counsel because of several alleged shortcomings by Swano before trial, during trial and sentencing, and after trial; (4) whether he was denied effective assistance of trial counsel because of several alleged shortcomings by the public defender; (5) whether he was denied effective assistance of appellate counsel because appellate counsel failed to raise several issues on his direct appeal; (6) whether he was denied due process by the State's concealment of a hypnotic interview session with Payne; and (7) whether he was denied due process because the trial court refused to grant discovery on his post-conviction claims.

The Illinois Post-Conviction Hearing Act provides a procedural mechanism through which a criminal defendant can assert "that in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122—1 (West 1998); see *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). In a post-conviction proceeding, the trial court does not redetermine a defendant's innocence or guilt, but instead examines constitutional issues which escaped earlier review. See *People v. Evans*, 186 Ill. 2d 83, 89 (1999). A post-conviction petition is a collateral attack upon a prior conviction and sentence, not a substitute for or an addendum to a direct appeal. *People v. West*, 187 Ill. 2d 418, 425 (1999). Consequently, any issues

which were decided on direct appeal are barred by the doctrine of *res judicata*; any issues which could have been raised on direct appeal are forfeited. *West*, 187 Ill. 2d at 425.

Once a capital defendant files a post-conviction petition, the trial court examines the petition and appoints an attorney for the defendant, if necessary. 725 ILCS 5/122—2.1(a)(1) (West 1998). The State then must answer or move to dismiss the petition. 725 ILCS 5/122—5 (West 1998). If the State files a motion to dismiss, the trial court must rule on the legal sufficiency of the defendant's allegations, taking all well-pleaded facts as true. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). A defendant is not entitled to an evidentiary hearing unless the allegations of the petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a constitutional violation. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Because a trial court's ruling on the sufficiency of the defendant's allegations is a legal determination, our review is *de novo*. *Coleman*, 183 Ill. 2d at 388-89.

Initially, we note that the trial court correctly dismissed several of the defendant's claims.

The defendant contends that his petition makes a substantial showing his due process rights were violated because the trial court refused to grant Swano sufficient time to prepare for trial and sentencing. This issue could have been raised on direct appeal and is forfeited.

The defendant also contends that his petition made a substantial showing that he received ineffective assistance of counsel from the public defender. The defendant charges that assistant public defenders failed to preserve his right to substitute trial judges and failed to file a continuance motion. These issues could have been raised on direct appeal and are forfeited. The defendant further charges that assistant public defend-

ers failed to investigate trial and mitigation evidence and failed to prepare for trial and sentencing. These claims, states the defendant, are revealed by the record. Accordingly, they also could have been raised on direct appeal and are forfeited.

The defendant further contends that his petition made a substantial showing his due process rights were violated because the State failed to notify Swano that Payne had undergone hypnosis. The defendant cites *People v. Gibson*, 117 Ill. App. 3d 270, 278 (1983), in which the appellate court held that the State must provide notice to the defense if it intends to introduce testimony of a previously hypnotized witness.

Here, the State notes that it informed the public defenders about Payne's hypnosis session. Assistant public defenders even informed the trial court that they discussed filing a motion to suppress Payne's identification. Though, in answers to the defendant's post-conviction interrogatories, Swano asserted, "I received no information regarding hypnosis of the victim Patricia Payne," Swano also stated, "To my knowledge, [the public defenders] turned over everything they had" when he entered his appearance. The State also correctly notes that Payne's hypnosis session focused only on the identification of her assailant's truck, not on the identification of her assailant. At trial, the State did not inquire into her identification of the truck, and Payne's testimony was admissible. See *People v. Zayas*, 131 Ill. 2d 284, 295 (1989) ("a witness' *hypnotically induced* testimony *** is not admissible in Illinois courts" (emphasis added)). The defendant failed to make a substantial showing his due process rights were violated, and the trial court correctly dismissed this claim.

We now turn to the defendant's remaining claims.

## DNA Testing

The defendant contends that his pending execution is

unconstitutional because the State possesses forensic evidence which would establish his innocence. He asserts that DNA testing of a Vitullo rape kit completed at the hospital where Payne was treated would cast doubt on whether he raped Payne and, accordingly, whether he murdered Hackett.

In his petition, the defendant alleged that a vaginal swab taken during Payne's July 17, 1983, hospital examination was delivered to and retained by the State Police Crime Lab; this swab purportedly was never tested. The defendant claimed,

> "[This swab] will have been maintained by the lab or evidence section in an acceptably preserved and uncontaminated state for DNA testing. Said swab would never be stored in a manner that would allow it to come into contact with foreign DNA. The swab has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect."

The defendant further alleged that the only direct evidence in this case was Payne's identification testimony; thus, the central issue in this case was identification. The defendant then cited section 116—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116—3 (West 1998)), which, he claimed, provides for such testing upon the allegations in his amended petition.

The defendant filed an appendix of exhibits supporting his petition, which included a form dated July 17, 1983, and entitled "AUTHORIZATION FOR RELEASE OF INFORMATION AND EVIDENCE TO LAW ENFORCEMENT AGENCY," in which Payne authorized St. Joseph Hospital in Joliet, Illinois, to release "One sealed evidence kit," "Medical records," "Slides/Smears/Specimens," and "Sealed clothing bag(s)" to Special Agent Meduga. The appendix also contained a form signed by Illinois Department of Law Enforcement crime scene technician Melvin Trojanowski entitled "EVI-

DENCE RECEIPT," which lists a "Vitullo Evidence Kit, marked Patricia Earl Payne, Received from S/A John Meduga" as agency exhibit 37. At trial, the State stipulated that defense exhibit 14 was the kit, which was later admitted into evidence. On the record before us, however, we cannot discern the condition of the Vitullo kit, and we do not know whether the kit contains any testable genetic material.

A claim of actual innocence based on newly discovered evidence may be raised in a post-conviction petition. See *People v. Washington*, 171 Ill. 2d 475, 489 (1996); see also *People v. Bull*, 185 Ill. 2d 179, 212 (1998) ("An important goal of the criminal justice process is the protection of the innocent accused against an erroneous conviction"). The supporting evidence must be new, material, noncumulative, and so conclusive that it would probably change the result on retrial. See *People v. Molstad*, 101 Ill. 2d 128, 134 (1984), quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959). The defendant has not provided evidence of his actual innocence, instead asserting that DNA testing would provide such evidence. Accordingly, the defendant raises the issue of whether DNA testing can be granted as post-conviction relief when it was unavailable at the time of his trial. The defendant contends that under either the fourteenth amendment of the United States Constitution or section 116—3, he may obtain the Vitullo kit for testing. We need not reach the constitutional issue, however, because section 116—3 provides an answer to the defendant's request. See *People v. Dunn*, 306 Ill. App. 3d 75, 80 (1999).

Although section 116—3 was not in effect at the time the defendant filed his amended petition, it was in effect when the trial court entered its order. Section 116—3 provides:

"(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA

testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116—3 (West 1998).

Thus, in order to present a *prima facie* case for forensic testing, the defendant must show that identity was the central issue at trial and that the evidence to be tested was subject to a sufficiently secure chain of custody. The trial court then must determine whether this testing will potentially produce new, noncumulative evidence that is materially relevant to the defendant's actual-innocence claim.

We note that the State, by arguing before this court that the defendant is not entitled to DNA testing of the Vitullo kit under section 116—3, is attempting to argue an issue it conceded before the trial court. In a February 16, 1996, hearing on the defendant's motions to produce the Vitullo kit and to obtain expert witness funds, the assistant State's Attorney stated that the Vitullo kit was

never tested at the time of the defendant's trial because the State never found any evidence to test. The assistant State's Attorney added, "If seminal fluid was there, we would be more than happy to say go ahead and test it because we are confident that it would prove that Mr. Johnson was the donor." In the December 3, 1997, hearing on the State's motion to dismiss the defendant's petition, the assistant State's Attorney, conceding that DNA testing was not available to the defendant at the time of his 1984 trial, advised the trial court:

"[I]f we want to set part of this case over till [*sic*] the 1st of the year in order for the State to do D.N.A. testing, I have no objection to that part of it. I would ask that we do it that way. We are close enough to the 1st of the year. I can't see paying experts to do that when the State Police Crime Lab will do it for free January 1st."

Even if the State did not waive its current argument, we conclude that the defendant's petition made a *prima facie* case for DNA testing. The defendant has shown that identity was the central issue at trial. The defendant also has shown that the Vitullo kit was subject to a sufficiently secure chain of custody. Though the State contends that the defendant has presented no evidence of the kit's location since his 1984 trial, such evidence would not be available to the defendant. The Vitullo kit, as a piece of real evidence admitted at trial, would have remained in the custody of the circuit court clerk after the defendant's conviction.

The State further contends that a DNA test on the Vitullo kit does not have the potential to produce materially relevant evidence. We recently construed the term "materially relevant" in *People v. Savory*, 197 Ill. 2d 203 (2001). In *Savory*, the defendant was convicted of two murders in 1977. The appellate court held that the defendant's confession was inadmissible, reversed the convictions, and remanded for a new trial. At the defendant's second trial, the State presented significant

evidence of the defendant's guilt, including a pair of the defendant's pants with a bloodstain whose type matched that of one of the victims. The defendant was again convicted of these murders in 1981. The appellate court affirmed the convictions. The defendant's post-conviction and *habeas corpus* petitions were denied, and in 1998, the defendant filed a motion for forensic testing under section 116—3. The defendant alleged that he did not commit the murders and that DNA testing would reveal the blood on his pants did not match that of one of the victims. The trial court denied this motion, concluding that favorable test results would not materially advance the defendant's actual-innocence claim. Even if the blood on the defendant's pants did not belong to the victim, the State's case would not be affected. The appellate court affirmed on different grounds, holding that the remedy under section 116—3 is available only in cases where a favorable test result would, by itself, completely vindicate the defendant.

After reviewing the language of section 116—3, we rejected the appellate court's restrictive reading of the term "materially relevant." *Savory*, 197 Ill. 2d at 213. Instead, we held that evidence which is "materially relevant" to a defendant's actual-innocence claim need not, standing alone, exonerate the defendant; rather, it must tend to "significantly advance" his claim of actual innocence. *Savory*, 197 Ill. 2d at 213. We stated, "if the legislature had intended to limit application of the statute to the instances in which a test result favorable to the defendant would, standing alone, lead to his complete vindication, it would have chosen a different way of expressing the statutory requirements." *Savory*, 197 Ill. 2d at 213; accord *People v. Hockenberry*, 316 Ill. App. 3d 752, 758-59 (2000) ("the application of the statute is not limited to those situations where additional scientific testing would result in total vindication"); *People v. Ro-*

*kita*, 316 Ill. App. 3d 292, 301-02 (2000) ("the plain and unambiguous language [of section 116—3] evinces no legislative intent to limit the use of scientific testing only to situations where the testing will result in total vindication or has the potential to exonerate the defendant").

We held that the determination of whether the forensic evidence is "materially relevant" to the defendant's actual-innocence claim requires an evaluation of the evidence introduced at trial, as well as the evidence the defendant seeks to test. *Savory*, 197 Ill. 2d at 214. After reviewing the record, we found that testimony about the source of the bloodstain, which the State did not present until rebuttal argument, was only a minor part of its strong evidence against the defendant. *Savory*, 197 Ill. 2d at 215. "Under these circumstances, a test result favorable to defendant would not significantly advance his claim of actual innocence, but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State." *Savory*, 197 Ill. 2d at 215. See *People v. Urioste*, 316 Ill. App. 3d 307, 312 (2000) ("had the legislature intended the overwhelming nature of other evidence to be a factor in granting a motion filed pursuant to section 116—3, it would have said so").

Unlike evidence about the source of the bloodstain in *Savory*, evidence about the source of genetic material in the Vitullo kit was never presented at trial. That is, the defendant here does not seek merely to impeach the State's evidence. Instead, he seeks to present, for the first time, evidence about the genetic identity of Payne's assailant. Further, unlike the defendant in *Savory*, the defendant here never made damning admissions placing himself at the crime scene. The State presented a strong, but largely circumstantial, case; the only direct evidence of the defendant's guilt came from Payne's identification. A favorable result on a DNA test of the Vitullo kit would

significantly advance the defendant's claim that he did not rape Payne, which, in turn, would significantly advance his claim that he did not murder Hackett. "If the available DNA evidence is capable of supporting such determination, there is no valid justification to withhold such relief if requested on postconviction review." *Dunn*, 306 Ill. App. 3d at 81. The trial court erred in refusing to allow DNA testing of any testable genetic material in the Vitullo kit pursuant to section 116—3.

### Ineffective Assistance of Trial Counsel William Swano

The defendant contends that his petition made a substantial showing that he received ineffective assistance of counsel from Swano. In the introduction to his petition, the defendant charged:

> "Milton Johnson had the extreme misfortune of placing his trust in a drug-abusing, corrupt, unethical, and incompetent 'attorney'—a man who is now a convicted felon and who has repeatedly testified to bribing judges, witnesses, and otherwise fixing murder cases (as opposed to providing effective ethical assistance of counsel). The attorney, William Swano, \*\*\* took $15,000 from Milton Johnson's family and promised them a proper defense for their son; he told them that he would use some of the money to retain experts to counter the State's case. Swano, however, did no investigation into either trial evidence or mitigation, presented no expert rebuttal evidence, and based his defense primarily on material that was ultimately not allowed into evidence."

The defendant's petition provided specifics. First, the defendant asserted that Swano should not have entered his appearance because the trial court refused to grant him sufficient time to prepare for trial and sentencing and because he was operating under a conflict of interest due to personal and financial problems. Second, the defendant asserted that Swano was otherwise ineffective in numerous ways: (1) he lied to the trial court about his trial preparation while attempting to obtain continu-

ances on June 25 and July 16, 1984; (2) he failed to review the discovery material tendered by the State; (3) he failed to interview prosecution witness Shoemaker before trial and failed to introduce available evidence in support of a motion *in limine* to bar her testimony; (4) he failed to investigate the police discovery of the Great America receipt in the assailant's truck; (5) he failed to interview parole officers who would have provided testimony in support of a motion to quash the defendant's arrest; (6) he failed to engage expert forensic witnesses to examine the rape kit and the fiber evidence and to debunk the State's Neutron Activation Analysis (NAA) evidence, and he failed to file a motion to bar NAA evidence; (7) he failed to present available evidence in support of a motion *in limine* to bar Payne's in-court identification; (8) he failed to file a motion to bar Payne's testimony based on hypnosis; and (9) he failed to litigate properly the defendant's post-trial motion. Third, the defendant asserted that Swano failed to prepare or investigate aggravation and mitigation evidence.

The defendant's ineffective-assistance claims against Swano can be distilled into a single contention. The defendant argues that Swano's mounting personal problems led him to neglect the defendant's case while attempting to keep the defendant's fee. As the defendant states in his petition: "Once in the case, Swano's concern became avoiding the ire of the court and any situation where his withdrawal (and refund of unearned money already deposited in his own account ***) might be ordered or demanded." Swano's lack of preparation infected the defendant's entire trial and sentencing proceedings. The adversarial system broke down, and the defendant was denied effective assistance of trial counsel. Because the basis for this contention—Swano's personal problems—is *dehors* the trial record, this claim is not forfeited. *People v. Orange*, 168 Ill. 2d 138, 149 (1995).

Initially, we note that the defendant characterizes Swano's conduct as a conflict of interest, arguing that Swano's pecuniary obligations outweighed his ethical obligations to the defendant. We reject this argument: such conflict-of-interest claims must be analyzed as claims of ineffective assistance of counsel. See *People v. Titone*, 151 Ill. 2d 19, 31-32 (1992). Claims of ineffective assistance of counsel are analyzed under the two-prong, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Under *Strickland*, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance prejudiced the defendant by creating a reasonable probability that, but for counsel's errors, the trial result would have been different. *People v. Alvine*, 173 Ill. 2d 273, 293 (1996). A reasonable probability is a probability sufficient to undermine confidence in the result of the trial—that is, to indicate that defense counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Enis*, 194 Ill. 2d at 376. Unless the defendant makes both showings, we cannot conclude that his conviction or death sentence resulted from a breakdown of the adversarial process. See *People v. Munson*, 171 Ill. 2d 158, 184 (1996).

On June 19, 1991, almost seven years after the defendant's conviction, Swano was indicted on federal racketeering charges relating to his representation of various gang members. The indictment specified that Swano repeatedly bribed judges, presented perjured evidence, and received cocaine in exchange for his legal services. Swano agreed to cooperate with federal authorities and was reindicted for explicit judicial corruption between 1980 and 1990. He pleaded guilty and is currently incarcerated.

The defendant's post-conviction attorney summarized Swano's testimony in the trial of former Cook County Circuit Judge Thomas Maloney. See generally *United States v. Maloney*, 71 F.3d 645, 650-52 (7th Cir. 1995). According to the defendant's attorney, Swano's testimony established that in 1984, while representing the defendant in this case, Swano was engaged in a demanding law practice, was using drugs, was defending foreclosure proceedings on various properties, and was forced to file personal bankruptcy. In his testimony, Swano stated, "I did illegal criminal activities [from 1975 though 1990]. I was an unethical lawyer. *** Part of the unethical part of what I did was lie." Lies, according to the defendant, were a serious problem in this case.

In his first appearance before the trial court on June 1, 1984, Swano asked for a continuance. He indicated to the trial court that he would not be prepared for trial scheduled the next day because he had received no police reports and no discovery, and he had interviewed the defendant for only one hour. The trial court reluctantly reset the trial date to July 1, 1984. Swano vowed to prepare diligently the defendant's case.

On June 25, 1984, Swano presented a motion for a continuance. Swano stated that he and co-counsel had made this case their priority, but had not completed their review of over 5,000 pages of discovery. Swano mentioned that he intended to hire a forensic fiber expert to review the report of the State's fiber expert. He also asserted, "There are hundreds of other pages of scientific evidence, specific ballistics, fingerprints, hair, blood, other types of evidence that has [sic] to be digested by the Defense and has [sic] to explored to be retained by the Defense ***." Denying a continuance, in Swano's words, would subject the defendant to "an unfair, ill-prepared, ineffective assistance of counsel." Swano also told the court that he had interviewed approximately 10 witnesses since he

entered his appearance. When asked by the court whether he had hired his forensic scientist yet, Swano answered, "He apparently was out of town last week, and I have not even personally spoken with him. It's not one forensic person, Judge. There are many experts to be retained. \*\*\* I'm not sure [how many] at this time. I have to interview the State forensic people to determine what their testimony will be." When asked by the court what the defense had done in the last 30 days, Swano answered:

"[W]e have been collating, organizing, researching all the material received as well as the continued discovery that we receive in our office every day.

Every day I get another piece of discovery, another piece of police reports in my office, and what we have been doing is organizing the case and putting it together to see what we are up against."

The trial court granted a continuance until July 23, 1984.

On July 16, 1984, Swano presented another motion for a continuance. In support of this motion, Swano stated:

"Two weeks ago, approximately two weeks ago, this Court on a similar motion granted us a two week continuance.

Since that time, myself, [co-counsel], [a student law clerk] and other persons associated with the defense of this trial, have worked diligently to go through the voluminous material that we had received from the Public Defender's office, and also to digest documents that we have received during that time from the State's Attorney's office.

We have interviewed approximately forty to fifty witnesses in the last two weeks and have made every diligent effort [ ] [w]e feel necessary to defend Mr. Johnson and prepare.

At this point in time, it is—it is our contention that we need more time. And I can't specifically point to the things that have to be done, because there's a lot of things that have to be done.

There's more witnesses to interview. There's physical evidence that has yet to have been seen by the staff.

There is further discovery matters that have to be resolved between [State's Attorney's office representatives] and our staff here.

There is a lot more research to be done for issues that we have identified, that willcome [*sic*] up during the course of the trial.

Quite frankly, what we are asking for is some more time to—to more adequately prepare, more time to more adequately research the various legal issues involved in this case."

The trial court denied this motion, and the defendant's case proceeded to trial 10 days later.

According to the defendant, Swano lied when he told the court on June 25 that he had interviewed 10 witnesses because, at that time, he had not yet interviewed Payne, Shoemaker, the defendant's family, or police officers involved in the investigation of these crimes. Further, Swano admitted that he had not interviewed any forensic experts. According to the defendant, Swano also lied when he told the court on July 16 that he had interviewed 40 to 50 witnesses, because only a full investigation of trial and sentencing evidence would have uncovered this number of witnesses. Swano's statement defies credibility in light of the fact that he presented no mitigation evidence at sentencing.

The defendant's allegations concerning Swano's lies about his lack of preparation are more troubling in light of his answers to the defendant's post-conviction interrogatories. In response to the defendant's interrogatory asking whether Swano hired an expert to evaluate the fiber evidence in this case, Swano answered, "Don't remember." In response to the defendant's interrogatories asking whether Swano hired experts to evaluate the bullet composition, NAA, or ballistic evidence in this case, Swano answered no. Swano also admitted that he hired no mitigating or sentencing experts in this case. When asked whether he received any fiber, bullet composition, NAA, or ballistic evidence reports from the

Will County public defender when he entered this case, Swano stated, "Don't remember. I do remember that when I accepted this case the P.D.'s office had not prepared the matter for trial and the discovery process was just beginning." When asked whether he received any investigation reports, witness interviews, or evidence evaluation from the public defender, Swano stated, "Don't remember anything other than some discovery." He added that, to his knowledge, the public defender "turned over everything they had." According to Swano, the only mitigation witness whom he remembered interviewing was the defendant's father. In an affidavit, the defendant's post-conviction attorney described a November 22, 1997, meeting with Swano, in which Swano also stated that "he definitely did not hire or engage any experts in the instant case and also did not recall consulting any experts, and that he thought he intended to hire a NAA expert but did not have enough time."

Swano's conduct previously has come before this court in an unrelated case. In *People v. Smith*, 177 Ill. 2d 53 (1997), a capital defendant asserted that she received ineffective assistance of counsel because Swano's knowledge of an impending federal indictment on racketeering charges prevented him from giving full attention to her trial. Relying upon *People v. Williams*, 93 Ill. 2d 309 (1982), the defendant asked for a new trial. In *Williams*, a capital defendant alleged that he received ineffective assistance of trial counsel because his attorney was defending himself against a disciplinary complaint at the same time he was representing the defendant. Considering the unique circumstances of this capital case, we declined to apply established tests for claims of ineffective assistance of trial counsel and, instead, ordered a new trial in "the interests of justice." *Williams*, 93 Ill. 2d at 325.

Holding that the "unique circumstances" in *Williams* were not present in *Smith*, we rejected the defendant's argument that Swano's misconduct entitled her to a new trial. *Smith*, 177 Ill. 2d at 88-89 (citing *People v. Franklin*, 167 Ill. 2d 1, 18 (1995), and *People v. Szabo*, 144 Ill. 2d 525, 529 (1991)). Swano did not appear before the ARDC during the defendant's trial, and he was not indicted until four months after his representation of the defendant ended. *Smith*, 177 Ill. 2d at 89. Further, Swano represented only the defendant in this case, and he was assisted by another attorney. *Smith*, 177 Ill. 2d at 90. Finally, the defendant pointed only to a single instance at trial—Swano's failure to cross-examine a prosecution witness about inducements to testify—when she purportedly received ineffective assistance of counsel. *Smith*, 177 Ill. 2d at 90. Instead, we held that *Strickland* governed the defendant's ineffective-assistance claims. *Smith*, 177 Ill. 2d at 90. Analyzing this claim under *Strickland*, we concluded that Swano's decision not to cross-examine was a strategic decision, insulated from constitutional attack. *Smith*, 177 Ill. 2d at 93.

Unlike Swano's failure to cross-examine a prosecution witness in *Smith*, Swano's alleged failures in this case are much more pervasive. The defendant claims that Swano failed to interview witnesses, failed to review the discovery material which he received from the State, and failed to investigate and present crucial evidence at trial and sentencing. The defendant also claims, and Swano concedes, that he failed to hire any expert forensic witnesses. These allegations against Swano do not involve mere strategic decisions; they involve decisions which go to the core of the defendant's constitutional guarantee of effective assistance at trial. The defendant's allegations make a substantial showing that Swano's performance was substandard.

Further, the defendant's allegations make a substan-

tial showing that this substandard performance caused prejudice. As we have noted, the State presented a strong, but largely circumstantial, case against the defendant. Swano's defense was limited to attacking the identification evidence and to filing motions *in limine* to exclude portions of the State's evidence. Because Swano was unprepared, he never subjected the State's case to meaningful adversarial testing. Additional preparation by Swano, especially with regard to expert forensic testimony, may have yielded a different result.

We conclude that the defendant made a substantial showing that Swano's representation so undermined the proper function of the adversarial system that the defendant's trial cannot be relied upon to have produced a just result. Because the defendant's allegations meet the benchmark for *Strickland* claims, these allegations are consequently subject to further investigation. See 725 ILCS 5/122—6 (West 1998). The trial court erred in dismissing the defendant's ineffective-assistance claims against Swano without an evidentiary hearing.

### Ineffective Assistance of Appellate Counsel

The defendant contends that his attorney in his direct appeal was ineffective for failing to raise several issues: (1) whether the defendant was denied due process because the trial court refused to grant sufficient time for Swano to prepare the defendant's case for trial and sentencing; (2) whether the defendant's appointed attorneys were ineffective for failing to remove Judge Orenic by automatic substitution and failing to prepare the defendant's case for trial; and (3) whether Swano was ineffective for a variety of reasons, all related to his personal problems and lack of trial preparation.

The *Strickland* test applies to claims of ineffective appellate counsel. *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989). A defendant who claims that appellate counsel was ineffective must show that the failure to

raise an issue on appeal was objectively unreasonable and this decision prejudiced the defendant. *Enis*, 194 Ill. 2d at 377; *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Normally, appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *People v. Mack*, 167 Ill. 2d 525, 532-33 (1995). Appellate counsel need not brief every conceivable issue and may refrain from developing nonmeritorious issues without violating *Strickland* (*People v. Simms*, 192 Ill. 2d 348, 362 (2000)), because the defendant suffered no prejudice unless the underlying issue is meritorious (*People v. Easley*, 192 Ill. 2d 307, 329 (2000)). Consequently, the prejudice inquiry requires us to examine the merits of the claims not raised by appellate counsel.

The defendant's first claim is nonmeritorious. Granting a continuance lies within the sound discretion of the trial court. *People v. Williams*, 173 Ill. 2d 48, 92 (1996); *People v. Sanchez*, 115 Ill. 2d 238, 262 (1986). On a charge of capital murder, the defendant should be given every opportunity to investigate witnesses and prepare his defense. See *People v. Crump*, 5 Ill. 2d 251, 263 (1955) (denying a continuance was an abuse of discretion where the defense had a mere 10 to 11 days to interview 48 witnesses). However, "[j]udicial patience need not be infinite" (*People v. Williams*, 92 Ill. 2d 109, 116 (1982)), and the defendant's right to counsel of his choice cannot be employed as a shield against an inevitable trial (*People v. Solomon*, 24 Ill. 2d 586, 590 (1962)). See *People v. West*, 137 Ill. 2d 558, 588 (1990).

Here, Swano entered his appearance on the eve of trial, and the trial court granted three continuances, giving Swano 55 days to prepare for trial. This amount of time is not exceedingly long; similarly, it is not exceedingly short, considering that, prior to Swano's appearance, the public defender had more than three months to prepare the defendant's case. The trial court did not

abuse its discretion, and appellate counsel was not ineffective for failing to raise this issue.

The defendant's second claim is also nonmeritorious. Strategic decisions, such as pretrial motion practice, are insulated from *Strickland* challenges. See *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991); *People v. Bryant*, 128 Ill. 2d 448, 459 (1989). Here, the defendant's substitution of judge motion may have been handled differently, but we cannot say the public defender's decisions constituted substandard representation. Additionally, after reviewing the record, we cannot say the public defender failed to prepare the defendant's case. Appellate counsel was not ineffective for failing to raise the issue of appointed counsel's effectiveness.

Finally, the issues related to Swano's personal problems and lack of trial preparation were outside the record and not fully developed when the defendant's case was on direct appeal. The defendant's appellate counsel was not ineffective for failing to raise claims that did not yet exist.

### Discovery

Finally, the defendant asserts that the trial court abused its discretion when it failed to allow discovery on the allegations in his post-conviction petition.

The defendant initially made numerous discovery requests. The trial court denied the majority of these requests, but entered an order to have Swano transported from federal prison in Greenville, Illinois, to the Will County courthouse, giving the defendant's attorney an opportunity to speak with him. Once Swano arrived in Joliet, however, he refused to be deposed and insisted that his cooperation would be limited to answering written interrogatories. Swano's interrogatory answers were summarily brief, and, on the final page of the defendant's interrogatories, Swano added, "I refuse to answer any other questions relating to my personal case or conduct

other than matters regarding Milton Johnson and my role as his attorney."

A trial court has inherent discretionary authority to order discovery in post-conviction proceedings. See *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 183 (1988); *People v. Rose*, 48 Ill. 2d 300, 302 (1971). A court must exercise this authority with caution, however, because a defendant may attempt to divert attention away from constitutional issues which escaped earlier review by requesting discovery. *People v. Hickey*, 204 Ill. 2d 585 (2001); *Enis*, 194 Ill. 2d at 415. Accordingly, the trial court should allow discovery only if the defendant has shown "good cause," considering the issues presented in the petition, the scope of the requested discovery, the length of time between the conviction and the post-conviction proceeding, the burden of discovery on the State and on any witnesses, and the availability of the evidence through other sources. *Daley*, 123 Ill. 2d at 183-84; see *People v. Fair*, 193 Ill. 2d 256, 264-65 (2000). We will reverse a trial court's denial of a post-conviction discovery request only for an abuse of discretion. *Fair*, 193 Ill. 2d at 265. A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a "fishing expedition." *Enis*, 194 Ill. 2d at 415.

In *People v. Fair*, 193 Ill. 2d 256 (2000), the defendant was convicted of two murders and sentenced to death. Following his conviction, the defendant learned that the judge who presided over his trial had engaged in an extensive pattern of judicial corruption in the time before and after the trial. We held that the defendant was entitled to discovery of evidence obtained by the Cook County State's Attorney's office in its investigation of the judge in order to establish a nexus between the judge's corruption and the defendant's trial. *Fair*, 193 Ill.

2d at 267. Because the judge had pleaded guilty, all the evidence concerning his criminal conduct remained in the State's control. *Fair*, 193 Ill. 2d at 266. We reasoned the defendant could not establish a nexus between this conduct and his conviction without access to that evidence. *Fair*, 193 Ill. 2d at 266. See also *Bracy v. Gramley*, 520 U.S. 899, 908, 138 L. Ed. 2d 97, 106, 117 S. Ct. 1793, 1799 (1997) (holding that allegations of judicial corruption against the judge who presided over the defendant's trial established "good cause" for the defendant's discovery request); *cf.* 188 Ill. 2d R. 416(e) ("Discovery Depositions in Capital Cases").

Like the evidence in *Fair*, the evidence of Swano's misconduct was unknown during the defendant's trial. Because Swano refused to cooperate with the defendant, the trial court abused its discretion by refusing to order his evidence deposition.

## CONCLUSION

The trial court erred in refusing to allow DNA testing of the Vitullo kit pursuant to section 116—3. The trial court also erred in dismissing without an evidentiary hearing the defendant's post-conviction claim that he received ineffective assistance from retained trial counsel William Swano. Finally, the trial court abused its discretion in refusing to order Swano's evidence deposition. The trial court properly dismissed the defendant's other post-conviction claims. For these reasons, we affirm in part, reverse in part, and remand to the circuit court for further proceedings.

> *Affirmed in part and*
> *reversed in part;*
> *cause remanded.*

CHIEF JUSTICE HARRISON, specially concurring:

I agree with the majority's analysis and its conclusion that the circuit court erred in refusing to allow DNA

testing of the Vitullo kit. I also agree that the circuit court abused its discretion when it refused to order Swano's evidence deposition and that the court should not have dismissed, without an evidentiary hearing, Johnson's claim that Swano had provided ineffective assistance of counsel.

I write separately because I would go beyond the majority's disposition and hold that Johnson is entitled to immediate post-conviction relief. Regardless of the outcome of any further proceedings on remand, Johnson's convictions and sentences cannot stand. That is so because Johnson was tried, convicted and sentenced under a death penalty law that violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). *People v. Bull*, 185 Ill. 2d 179, 225-29 (1998) (Harrison, J., concurring in part and dissenting in part).

Our court has now adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us on review. Whether the new rules will be sufficient to place this state's capital punishment system within the tolerances permitted by the state and federal constitutions is a question we cannot yet answer. It is clear, however, that no proceeding conducted without the benefit of those rules can be deemed reliable. I would therefore reverse the circuit court's judgment in full, set aside Johnson's convictions and sentences, and order that he be granted a new trial.

JUSTICE KILBRIDE, concurring in part and dissenting in part:

I concur in part with the majority's judgment concerning the lack of DNA testing of the Vitullo kit, the failure to allow Swano's evidence deposition, and the improper dismissal of Johnson's ineffective assistance of counsel claim. Nevertheless, I agree with Chief Justice Harrison that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe that the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Thus, this cause should be remanded for a new trial conducted in compliance with the new rules.